**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**NEW BERN DIVISION**

IN RE:

**JSMITH CIVIL, LLC,**                    **CASE NO. 23-02734-5-JNC**
**CHAPTER 11**

    **DEBTOR.**

---

**JSMITH CIVIL, LLC,**

    *Plaintiff,*

    vs.                                   **AP NO. 25-_____-5-JNC**

**SECOND WIND CONSULTANTS, INC.,**

    *Defendant.*

---

## COMPLAINT

---

**NOW COMES** Debtor-Plaintiff JSMITH CIVIL, LLC ("Debtor," "Plaintiff," or "JSC"), by and through undersigned counsel of record, and complaining of Defendant SECOND WIND CONSULTANTS, INC. ("Defendant" or "SWC"), and hereby alleges and asserts as follows:

### INTRODUCTION AND NATURE OF ACTION

1.     This is an action by the Debtor, against Defendant, seeking the following:

    A. Avoidance and recovery of payments and transfers from the Debtor totaling $287,000.00, as constructively fraudulent transfers pursuant to §§ 544, 547(b), 548 and 550 of the Bankruptcy Code and the Uniform Voidable Transactions Act, N.C. Gen. Stat. § 39-23.1, *et seq.* (the "UVTA").

B. Turnover and recovery of the sum of at least $247,000.00, as "property of the estate" pursuant to § 542 of the Bankruptcy Code; and

C. Actual, compensatory, and treble damages, and reasonable attorneys' fees, costs, and expenses for fraud, conversion, trespass to chattels, negligent misrepresentation, and violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* (the "UDTPA").

## JURISDICTION AND AUTHORITY

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334. This matter and the relief requested herein is a "core proceeding," as that term is defined under 28 U.S.C. § 157(b)(2), because it arises under title 11 of the United States Code, arises in connection with the above-captioned chapter 11 bankruptcy proceeding, see id. §§ 157(b)(2)(A) & 157(b)(2)(C).

3.     Pursuant to Budget Service Co. v. Better Homes of Va., 804 F.2d 289 (4th Cir. 1986), this Court has jurisdiction to enter a final and dispositive Order in this matter however, and to the extent the Court finds any of the claims for relief asserted herein to be non-core proceedings, the Debtor consents to entry of a final Order in this matter in accordance with 28 U.S.C. § 157(c)(2).

4.     This Court, likewise, has authority to hear this matter pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391, 1408 and 1409, as all of the actions complained of and giving rise to the claims alleged herein arose in this judicial district, within which the Debtor is present, regularly conducts

2

its business operations and affairs.

6.      This NCourt has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 151, and 157, as it arises in and concerns matters affecting the administration of bankruptcy estate in the above-captioned case, *see id.* §157(b)(2)(A), seeks an Order requiring turnover property of the estate under § 542 of the Bankruptcy Code, *see id.* §157(b)(2)(E), and concerns rights available, duly established, under the provisions of the Bankruptcy Code.

7.      The relief sought herein is a core proceeding, as that term is defined under 28 U.S.C. § 157(b)(2), as it arises in the administration of the above-captioned chapter 11 bankruptcy proceeding.

8.      Likewise, the Court has jurisdiction over this matter pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

## IDENTIFICATION OF THE PARTIES

9.      The Debtor, a North Carolina limited liability company maintaining a principal place of business in Goldsboro, North Carolina, filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code on September 19, 2023 (the "Petition Date"), BK Case No. 23-02437-5-JNC (the "Bankruptcy Case").

10.     In the Bankruptcy Case, the Debtor filed Official Form 206Sum entitled "Summary of Your Assets and Liabilities and Certain Statistical Information" along with the Schedules and Statement of Financial Affairs [D.E. 68], which revealed that on the Petition Date, the Debtor was insolvent based upon the following:

| | |
|---|---|
| **Total Assets** | $8,889,428.15 |
| **Total Liabilities** | $33,461,594.69 |

11.    The Debtor's liabilities ($33,461,594.69) exceeded the value of its assets and property ($8,889,428.15), by at least $24,572,166.54, as of the Petition Date.

12.    Defendant is a corporation formed and existing under the laws of the Commonwealth of Massachusetts, which maintains a principal place of business at 136 West Street, Northampton,  Massachusetts 01060.

13.    Defendant advertises and markets itself as a turnaround consulting company, purporting to assist businesses and their owners across the United States of America with non-bankruptcy workouts, resolutions, and restructurings of existing debts and liabilities.

14.    Upon information and belief, and to achieve a non-bankruptcy resolution and restructuring of business and personal debts, Defendant advises, assists, and actively participates in the unilateral and unauthorized transfer of encumbered assets and property to newly-formed and debt-free entities through a "sham" sale purportedly conducted under Article 9 of the Uniform Commercial Code.

15.    The registered agent of Defendant, accepting service of process at 47 Pleasant Street, Northampton, Massachusetts 01060, is Aaron Samuel Todrin.

16.    The corporate officers of Defendant are as follows:

| Name of Officer | Position / Title |
|---|---|
| Aaron Samuel Todrin | President |
| Aaron Samuel Todrin | Treasurer |
| Aaron Samuel Todrin | Secretary |
| Adam Duso | Chief Executive Officer |
| Aaron Samuel Todrin | Director |

4

## FACTUAL ALLEGATIONS

17.     The Debtor, at all times relevant hereunder, was and remains a diversified heavy civil construction company that provides commercial contracting and site preparation services to projects across the State of North Carolina.

18.     At the height of the Debtor's business operations in 2021, the Debtor had over 200 employees and generated gross annual revenues in excess of $55,000,000.00.

19.     Due to unforeseen circumstances, including disputes preventing collection of outstanding accounts receivable for bonded and non-bonded projects in the calendar years ending 2022 and 2023, temporary suspension of its business operations due to COVID-19, and significant and continuing delays in major construction projects, the Debtor began to experience significant financial problems as a result of its inability to pay its operating expenses associated with its ongoing and long-term commercial construction projects throughout the State of North Carolina, as well as the payment obligations to its governmental and non-governmental creditors, vendors, and suppliers.

20.     The Debtor's dire financial condition, and continuing insolvency and negative cash flow impacted its ability to perform and/complete the construction services and furnish materials required for its various commercial construction projects.

21.     The Debtor, in need of assistance and evaluating its options for a restructuring and resolution of the financial problems that it was experiencing,

5

contacted and retained the services of Defendant to develop and implement a non-bankruptcy plan that would reduce, eliminate, and/or restructure the Debtor's overwhelming secured and unsecured indebtedness owed to its creditors.

22.    Prior to the Petition Date, and to formalize the engagement, the Debtor and Defendant entered into a Business Consulting Agreement dated March 17, 2023 (the "SWC Consulting Agreement"), whereunder and in exchange for payment of the sum of $300,000.00 (the "Contract Amount").   A copy of the SWC Consulting Agreement is attached hereto as **EXHIBIT 1** and incorporated herein by reference.

23.    Per the terms of the SWC Consulting Agreement, the Contract Amount was payable in fifteen (15) monthly installments of $20,000.00 and, in exchange for which, Defendant was to provide financial and non-bankruptcy turnaround services with the goal of resolving the outstanding financial defaults and obligations of the Debtor.

24.    Under the SWC Consulting Agreement, Defendant was engaged to contact, communicate, negotiate, eliminate, settle, or otherwise resolve the Debtor's outstanding indebtedness, obligations, and liabilities owed to its creditors totaling in excess of $21,755,140.00.

25.    Section 9 of the SWC Consulting Agreement provided as follows:

**Termination by SWC.** SWC may terminate this Agreement if Client breaches any of the terms of the Agreement contained herein. Breaches include, but are not limited to the following:

a) Client fails to make payments set forth in the Fee Schedule;

b) Client misrepresents or fails to disclose any material facts relating to the Program; or fails to fully disclose all financial

6

information requested by SWC; or

c) Client in any way prevents SWC from doing its job, or client fails to adhere to SWC's strategies.

Any and all monies paid to SWC will be treated as compensation for work completed and will not be refundable. In the event this Agreement is terminated after the Triggering Points, as defined below, the full fee described in this Agreement becomes due, payable, and enforceable.

26.    The primary points of contact with Defendant were the following:

| Name | Title/Position |
|---|---|
| Jared Nugent ("Nugent") | Director of Counseling |
| Jeff Chaisson ("Chaisson") | Senior Case Manager |

27.    Upon information and belief, neither Nugent nor Chaisson are attorneys, licensed to practice law in any state or commonwealth in the United States of America, including but not limited to the State of North Carolina.

28.    The Debtor, prior to the Petition Date, remitted payments to Defendant totaling $287,000.00, which are summarized as follows:

| Source of Payment/Transfer | Transfer Date | Type of Transfer | Transferee | Transfer Amount |
|---|---|---|---|---|
| American Express Bank | 3/17/2023 | ACH | Second Wind Consultants, Inc. | $20,000.00 |
| Wells Fargo Bank, N.A. Acct No. ***4844 | 4/28/2023 | Wire Transfer | Second Wind Consultants, Inc. | $20,000.00 |
| Applied Bank Account No. **7552 | 5/9/2023 | Wire Transfer | Second Wind Consultants, Inc. | $247,000.00 |

(collectively, the "Transfers").

29.    On April 4, 2023, the Debtor's business operations and financial affairs were so dire and calamitous that its largest creditor, WESTFIELD INSURANCE COMPANY ("Westfield"), which issued certain payment, performance, and surety

7

bonds to at least thirty-four (34) of the Debtor's commercial construction projects (the "Bonded Projects"), exercised its rights under the Surety Bonds, and took over the Bonded Projects.

30.     Specifically, this action and course of conduct undertaken by Westfield was based upon the significant cash flow issues the Debtor was encountering and its inability to discharge and pay indebtedness owed to its subcontractors, materialmen, equipment vendors, and employees associated with the various construction projects.

31.     Prior to, and at the time of, the Transfers, the Debtor was and continued to suffer from crippling financial distress, insolvency, and inability to pay its ongoing operating expenses, which had forced Westfield to intervene, take over, and obtain complete control over the Bonded Projects in April 2023.

32.     Defendant knew, on March 17, 2023, April 28, 2023, and May 9, 2023 (the "Transfer Dates'), that the Debtor was insolvent, unable to pay its outstanding debts and obligations as they became due, and otherwise suffering from crippling financial distress.

33.     The timing and amount of the payment and transfer made by the Debtor on May 9, 2023 (the "May 2023 Transfer"), was contrary to the  terms and provisions of the SWC Consulting Agreement, including the fifteen-month payment schedule set forth therein.

34.     In connection with the remittance of the May 2023 Payment, the Debtor was told by Defendant that the May 2023 Payment would be treated as an advance payment and, at the Debtor's request, could be returned to (and accessed by) the

Debtor at any time and for any reason.

35.     Nugent, on behalf of Defendant, actually characterized the May 2023 Payment ss being held "in trust" and informed the Debtor that it would treated like a retainer or advance payment paid for legal representation.

36.     Based upon said representation and assurance provided by Defendant, through its officers, agents, and employees, the Debtor made the May 2023 Payment to Defendant, which represented an overwhelming majority of the monthly installments that the Debtor was required to pay under the SWC Consulting Agreement. Unbeknownst to the Debtor, Defendant's representation that the May 2023 Payment would be treated as an advance payment by the Debtor, which the Debtor could secure return of at any time and for any reason, was false and misleading.

37.     This false and misleading representation and assurances made to the Debtor, and relating to the ownership, access, and control over the sum of $247,000.00 comprising the May 2023 Payment, was made by Defendant with the intention that the Debtor rely on the same, and the Debtor did rely on the same to its detriment.

38.     The Debtor's reliance on Defendant, over which it provided power of attorney to negotiate and resolve certain debts, claims, obligations, and liabilities associated with its business operations and financial affairs, as well as the misrepresentation, false assurances, and other statements concerning the May 2023 Payment, was reasonable, under the circumstances.

39.     Without exclusive and critical knowledge of the undisclosed reality that

Defendant had no intention whatsoever of returning or permitting the Debtor to access any portion of the May 2023 Payment, the Debtor caused the sum of $247,000.00 to be remitted and paid to Defendant on May 9, 2023.

40. The Debtor would never have never paid the May 2023 Payment if Defendant had truthfully disclosed that it would not, under any circumstances, return or refund any portion of the May 2023 Payment to the Debtor once it was received.

41. Defendant, as a result of said false misrepresentation, statement, and assurance to the Debtor, was able to procure the May 2023 Payment, which represented at least twelve (12) month installments required under the SWC Consulting Agreement, less than sixty (60) days into the fifteen (15) month-long engagement thereunder.

42. Defendant, notwithstanding its duties, obligations, and responsibilities under the SWC Consulting Agreement, did not communicate with, negotiate, eliminate, or otherwise resolve any of the Debtor's outstanding liabilities, debts, and obligations owed to various creditors.

43. Defendant, aside from a weekly one-hour video conference, did not perform any services for which it was engaged under the SWC Consulting Agreement.

44. In fact, and based upon Defendant's failure to properly contact, communicate, and/or negotiate with the Debtor's creditors regarding payment, resolution, and/or settlement of the underlying debts, liabilities, and obligations, numerous creditors took adverse actions against the Debtor, including repossession

of equipment and vehicles, and commencement of civil actions seeking to enforce and collect the outstanding balances owed by the Debtor.

45. Throughout the engagement with Defendant, and rather than communicating and negotiating with its creditors, Defendant advocated and advised the Debtor to engage in less than arms-length transactions and prearranged sales of collateral and equipment under Article 9 of the Uniform Commercial Code,[1] whereby the Debtor's assets would be transferred to "friendly" third-party companies and entities, with said third parties utilizing financing that had been procured and arranged by Defendant.

46. In order to facilitate the foregoing, Defendant was suggesting that it conduct an onsite auction and sale through a preferred out-of-state auctioneer, whereby the "friendly" third parties who had obtained the necessary financing arranged by Defendant, could purchase certain "earmarked" equipment, collateral, and vehicles at predetermined and depressed prices, thereby structuring the sale towards a desired outcome and disposition, unbeknownst to lienholders and creditors.

47. The Debtor in July 2025, determined that the best course of action would be to voluntary seek relief under chapter 11 of the Bankruptcy Code in an attempt to restructure its outstanding debts, liabilities, and obligations and reorganization its

---

[1] Included within the proposed transactions was a sale-lease back agreement to sell the Debtor's assets, equipment, and vehicles to a third party, Civil Contracting, LLC, for an artificially depressed sales price, and whereby those same assets, equipment, and vehicles would be leased back to the Debtor or an additional third party. The Debtor never executed or consummated any such transaction or agreement with Civil Contracting, LLC, as advocated and proposed by Defendant.

11

business operations and financial affairs.

48.     The Debtor, on several occasions throughout July 2023 and August 2023, communicated and advised Defendant—through its agents, officers, and employees, Nugent and Chassion—that it would be filing a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code in order to restructure and reorganize its business operations and affairs.

49.     The Debtor, as a result, repeatedly told and advised Defendant that it would not entertain or engage in any of the proposed non-bankruptcy transactions that Defendant had been advocating for since execution of the SWC Consulting Agreement.

50.     Nugent, on at least one occasion and on behalf of Defendant stated that based upon the Debtor's intended filing of the Bankruptcy Case and that Defendant's services under the SWC Consulting Agreement were no longer needed or necessary, the May 2023 Payment that was previously made by the Debtor would need to be refunded and returned to the Debtor by Defendant.

51.     The Debtor on or about August 31, 2023, received correspondence and email from Defendant, notifying it that Defendant was unilaterally terminating the SWC Consulting Agreement (the "Termination Letter").  A copy of the Termination Letter is attached hereto as **EXHIBIT 2** and incorporated herein by reference.

52.     The Debtor, through counsel, on August 31, 2023, and immediately upon receipt of the Termination Letter, demanded return and/or refund of the May 2023 Payment that was previously made to Defendant or, in the alternative, Defendant's

12

basis for retention of said funds to the exclusion of the Debtor (the "Termination Letter Response").  A copy the Termination Letter Response, dated August 31, 2023, and approximately thirty (30) minutes after the Termination Letter was emailed, is attached hereto as **EXHIBIT 3** and incorporated herein by reference.

53.    Defendant, through its President, Aaron Todrin ("Todrin"), refused to return and/or refund to the Debtor any portion of the May 2023 Payment to the Debtor and, specifically, any discussion regarding said return or refund of any portion thereof would be a waste of time, as the SWC Consulting Agreement did not require that Defendant return or refund any portion of the May 2023 Payment.

54.    Defendant, on account of its five-month engagement with the Debtor under the SWC Consulting Agreement, received the aggregate sum of $287,000.00 from the Debtor on the Transfer Dates.

55.    Under the terms of the SWC Consulting Agreement, and based upon the five (5) months it was engaged and purportedly providing services to the Debtor, Defendant was only entitled to payment of the sum of $100,000.00, which represents five (5) monthly installments of $20,000.00, payable in accordance with Exhibit A to the SWC Consulting Agreement.

56.    Defendant, by virtue of its heavy-handed actions and conduct, including its false representations and assurances that induced the Debtor to remit the May 2023 Payment in the first instance, received $187,000.00, more than it was entitled to receive under the SWC Consulting Agreement prior to its unilateral termination thereof on August 31, 2023.

13

57.     Defendant did not provide consulting services to the Debtor under the SWC Consulting Agreement or otherwise, between March 17, 2023, and August 31, 2023, with a value of $287,000.00.

58.     Defendant, moreover, did not provide consulting services to the Debtor under the SWC Consulting Agreement or otherwise, between March 17, 2023, and August 31, 2023, with a value of $100,000.00.

59.     Post-petition, and through counsel, the Debtor demanded turnover of, inter alia, a portion of the Transfers that were made to Defendant, specifically, the sum of $247,000.00 that comprised the May 2023 Payment (the "Turnover Demand Letter").  A copy of the Turnover Demand Letter is attached hereto as **EXHIBIT 4** and incorporated herein by reference.

60.     The Turnover Demand Letter was not returned as undeliverable or unclaimed.

61.     Despite receiving the Turnover Demand Letter, including the notification that retention of the May 2023 Payment constituted an unauthorized exercise of dominion and control over property of the estate under § 362(a)(3) of the Bankruptcy Code in violation of the automatic stay, Defendant has not returned or refunded any portion of the May 2023 Payment to the Debtor.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Turnover of Property of the Estate**
**[11 U.S.C. § 542]**

62.     The Debtor incorporates herein by reference all allegations in this Complaint as if fully set forth herein.

14

63. Section 542(a) provides, in pertinent part, as follows:

> [A]n entity, other than a custodian in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a); see In re Challenge Air Int'l, Inc., 952 F.2d 384, 386 (11th Cir. 1992). Section 363 of the Bankruptcy Code, in turn, provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[] . . . ." Id. § 363(b)(1); see In re Pyatt, 486 F.3d 423, 427 (8th Cir. 2007) ("By referring to § 363, a section which authorizes the trustee to 'use, sell, or lease . . . property of the estate,' the drafters of § 542(a) made it clear that the turnover obligation applies to property of the estate").

64. The Debtor, as the moving party, must demonstrate under § 542(a), by a preponderance of the evidence, the following:

> (1) the property is in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 522[;] and (4) that the property is no of inconsequential value or benefit to the estate.

5 Collier on Bankruptcy ¶ 542.02[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); accord Bailey v. Suhar (In re Bailey), 380 B.R. 486, 490 (6th Cir. B.A.P. 2008).

65. Section 541 of the Bankruptcy Code defines "property of the estate" broadly to include, regardless of "wherever located and by whomever held, . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); see United States v. Whiting Pools, Inc., 462 U.S. 198,

205 (1983) (holding that "property of the estate" consists of every conceivable interest of the debtor in property as of the time the bankruptcy case is commenced, regardless of who has possession of it); accord In re Meier, No. 13-02323, 2013 WL 6135085, at *2 (Bankr. E.D.N.C. Nov. 21, 2013) (recognizing that "the definition of 'property of the estate' 'has been construed most generally and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.'" (quoting Segal v. Rochelle, 382 U.S. 375, 379 (1966))).

66.   Applicable non-bankruptcy law determines whether a debtor holds a legal or equitable interest in property, Butner v. United States, 440 U.S. 48 (1979), whereas § 541 of the Bankruptcy Code determines whether that interest constitutes "property of the estate" under § 541 of the Bankruptcy Code. In re Bryn Athyn Investors, 69 B.R. 452, 456 (Bankr. E.D.N.C. 1987).

67.   Prepetition retainers and prepayments of contractual liabilities and expenses, including that which comprised the May 2023 Payment made to Defendant by the Debtor, are "property of the estate" pursuant to §§ 541 and 1115 of the Bankruptcy Code, and subject to turnover under § 542(a) of the Bankruptcy Code. See In re Harvest Oaks Drive Assocs., LLC, No. 10-03145-8-SWH, 2011 Bankr. LEXIS 2044, at *15 (Bankr. E.D.N.C. Mar. 23, 2011); In re Carolina Premier Med. Grp., P.A., 2001 Bankr. LEXIS 1845, 2001 WL 1699220 at *3 (Bankr. M.D.N.C. 2001); In re Senior Hous. Alts., Inc., 444 B.R. 386, 2011 WL 165991 (Bankr. E.D. Tenn. 2011) (confirming that retainer is property of the estate); In re Datesman, 1999 Bankr. LEXIS 994, (Bankr. E.D. Pa. 1999) (observing that the right to a refund of the

16

retainer is an equitable interest of the debtor qualifying it as property of the estate under § 541 of the Bankruptcy Code); In re Printing Dimensions, Inc., 153 B.R. 715, 719 (Bankr. D. Md. 1993) (emphasis that a retainer is characterized to be property of the estate variously under § 541(a)(3), (a)(1), (a)(7) or (d) of the Bankruptcy Code). Prepayment of liabilities and expenses, which have yet to accrue, constitute "property of the estate" under § 541 of the Bankruptcy Code. In re Nichols, 491 F.3d 987, 990 (9th Cir. 2007) (emphasizing that the prepayment of tax liabilities and obligations constitutes "property of the estate" under § 541 of the Bankruptcy Code and was subject to turnover under § 542(a) of the Bankruptcy Code); In re Lavelle, No. 1-90-0254, 1991 Bankr. LEXIS 604, at *2-3 (Bankr. N.D. Cal. Apr. 17, 1991) (finding that "the amount of the debtor's prepayment over and above taxes actually owed on the date he filed his bankruptcy petition were property of the estate[.]").

68.    The May 2023 Payment totaling $247,000.00, representing prepayment of approximately twelve (12) of the monthly installments required under the SWC Consulting Agreement, is "property of the estate," as defined by §§ 541 and 1115(a)(2) of the Bankruptcy Code.

69.    Notwithstanding the fact that the Debtor was not in possession of any portion of the May 2023 Payment as of the Petition Date, which is upon information and belief, within the exclusive care, custody and control of Defendant, it constitutes "property of the estate" within the meaning of §§ 541 and 1115 of the Bankruptcy Code.

70.    The value of the May 2023 Payment that was made to the Debtor, is

17

$247,000.00, plus accrued interest allowed by applicable law.

71.     The amount of the May 2023 Payment totaling $247,000.00, is not of inconsequential value to the Debtor and/or the bankruptcy estate.

72.     The funds and monies represented by the May 2023 Payment, return for which has been demanded, are property of the type that the Debtor could utilize, sell, and/or lease in accordance with § 363 of the Bankruptcy Code.

73.     The amounts comprising the May 2023 Payment constitute property of the estate, as defined under §§ 541 and 1115(a)(2) of the Bankruptcy Code, and is subject to turnover pursuant to § 542(a) of the Bankruptcy Code.

74.     On account of the foregoing, and given that the sum of $247,000.00, comprising the May 2023 Payment, is property of the estate under §§ 541 and 1115(a)(2) of the Bankruptcy Code and is not of inconsequential value, the Debtor is entitled to entry of an Order by this Court requiring Defendant turnover the sum of $247,000.00, representing the May 2023 Payment, together with interest accruing thereon at the rate established by applicable law, immediately.

## SECOND CLAIM FOR RELIEF
### Avoidance of Constructively Fraudulent Transfers
### 11 U.S.C. §§ 544 and 548; N.C. Gen. Stat. § 39-23.1 *et seq*.

75.     The Debtor realleges and incorporates herein by reference all the allegations contained in the Complaint as if fully set forth in their entirety.

76.     The Transfers were each a direct and voluntary or involuntary conveyance, disposal, or parting with monetary funds and monetary amounts belonging to the Debtor and contained in its credit account with American Express

National Bank ("AmEx") and bank accounts with Applied Bank and Wells Fargo Bank, National Association ("Wells Fargo").

77.     All of the funds located in the Debtor's credit account with AmEx and bank accounts at Applied Bank and Wells Fargo, including those transferred and paid to Defendant on the Transfer Dates, were the sole and exclusive property of the Debtor.

78.     The Transfers that were made to, and received by, Defendant, each constitute a "transfer" within the meaning set forth in § 101(54) of the Bankruptcy Code.

79.     The Transfers were made to Defendant, via ACH, electronic funds transfer, or wire transfer from the Debtor's credit and bank accounts.

80.     The Debtor did not receive, in exchange for the Transfers, consulting services from Defendant under the SWC Consulting Agreement in an amount equal to the sum of $287,000.00.

81.     The Debtor, moreover, did not receive reasonably equivalent value in exchange for, specifically, the May 2023 Payment, because said funds were paid to Defendant on May 9, 2023, and represented an advance payment and/or prepayment of more than twelve (12) of the monthly installment payments that were scheduled to be paid to Defendant under Exhibit A to the SWC Consulting Agreement.

82.     Because Defendant unilaterally terminated the SWC Consulting Agreement on August 31, 2023, less than three (3) months after receiving the May 2023 Payment, and provided no further services after said date, the Debtor did not

19

receive reasonably equivalent value from Defendant in exchange for the May 2023 Payment.

83. Defendant, in order to provide reasonably equivalent value in exchange for the May 2023 Payment, which is disputed by the Debtor, would have been required to perform consulting services to the Debtor through, at least, May 2024.

84. Defendant did not provide any services to the Debtor, under the SWC Consulting Agreement or otherwise, after issuance of the Termination Letter on August 31, 2023, and—as a result—could not have provided reasonably equivalent value in exchange for the May 2023 Payment.

85. The minimal services provided by Defendant under the SWC Consulting Agreement were not beneficial to the Debtor, as it endorsed and laid out the framework for transactions that, if completed and undertaken, could have exposed the Debtor to additional civil and criminal liability.

86. The Debtor did not receive, in exchange for the Transfers, reasonably equivalent value from Defendant.

87. The Debtor did not receive, under the SWC Consulting Agreement or otherwise, consulting and other services from Defendant with a reasonable value of anywhere near the sum of $287,000.00.

88. The Transfers were made for less than reasonably equivalent value, in that the Debtor did not receive any value or benefit for payment of $287,000.00 to Defendants on the Transfer Dates.

20

89.     The Debtor, moreover, did not receive reasonably equivalent value in exchange for the Transfers because Defendant did not undertake any action, advise, or otherwise provide any actual and legitimate services to the Debtor under the SWC Consulting Agreement totaling anywhere near $287,000.00.

90.     The Debtor, as a result, did not receive reasonably equivalent value in exchange for the Transfers.

91.     At the time of each of the Transfers, prior to and after the Transfer Dates, Debtor was engaged in business or transactions, or was about to engage in business or transactions, for which any property remaining with the Debtor was unreasonably small capital.

92.     At the time the Transfers were made, the Debtor was insolvent, as evidenced by the fact that its outstanding liabilities, as of the Petition Date, totaled $33,461,594.69, and exceeded the value of its assets and property ($8,889,428.15), by at least $24,572,166.54.

93.     On the Transfer Dates, and beginning in February 2023, and continuing through the Petition Date, the Debtor was experiencing significant financial distress and inability to pay its ongoing operating expenses, including those amounts owed to subcontractors, materialmen, suppliers, vendors, and creditors, which was further exacerbated by the takeover of the Bonded Projects by Westfield in March 2023, and corresponding redirection and termination of the income and revenue the Debtor had been previously generating from the Bonded Projects.

21

94.     Defendant knew, or should have known, when it received each of the Transfers, the Debtor was insolvent and/or was at risk of becoming insolvent as a result of the Transfers.

95.     Upon information and belief, Defendant was advocating for Debtor to remit the May 2023 Payment because it knew, and understood, that the Debtor's insolvency would ultimately result in the Debtor being unable to pay the ongoing monthly contractual installments set forth in Exhibit A of the SWC Consulting Agreement.

96.     During the time period in which each of the Transfers were made, the Debtor intended to incur, or believed it would incur, debts and obligations beyond its ability to pay such debts and obligations once they came due or otherwise matured.

97.     Pursuant to § 548 of the Bankruptcy Code and/or N.C. Gen. Stat. § 39-23.1 *et seq.*, the Transfers to Defendant totaling $287,000.00 are avoidable, as constructively fraudulent transfers, under §§ 544, 548, and 550 of the Bankruptcy Code and the UTVA.

98.     Based upon the foregoing, the Debtor is entitled to avoidance of the Transfers totaling $287,000.00, as constructively fraudulent transfers pursuant to §§ 544 and 548 of the Bankruptcy Code and the UVTA.

### THIRD CLAIM FOR RELIEF
**Recovery and Preservation for the Benefit of the Estate**
[11 U.S.C. §550]

99.     The Debtor realleges and incorporates herein by reference all the allegations contained in the Complaint as if fully set forth in their entirety.

22

100.    Defendant is the initial transferee of the Transfers or the entity for whose benefit they were made.

101.    The Debtor is entitled to have and recover judgment against Defendant, in the amount of $287,000.00, representing the value of the Transfers, for the benefit of the estate pursuant to § 550 of the Bankruptcy Code.

**FOURTH CLAIM FOR RELIEF**
**Conversion**

102.    The Debtor incorporates herein by reference, all the allegations set forth in the Complaint, as if fully set forth herein.

103.    The Debtor, based upon the representations of Defendant when the May 2023 Transfer was made, remained the lawful and exclusive owner of the sum of $247,000.00, which it could retrieve and access from Defendant upon request and for any reason.

104.    The Debtor did not authorize, at any time, the cancellation or termination of all of its right, title, and interest in the sum of $247,000.00 deposited with, and paid to, Defendant, on May 9, 2023 (and referred to herein as, the May 2023 Payment).

105.    The Debtor was not aware, until August 2023, that Defendant was exercising complete dominion and control over the funds comprising the May 2023 Payment and, upon information and belief, categorizing the May 2023 Payment was being "earned immediately."

106. Defendant did not disclose or otherwise obtain the Debor's authority to complete and exclusive possession, ownership, dominion, and control over the funds comprising the May 2023 Payment.

107. The Debtor did not confer, any right, title, or interest to Defendant in funds comprising the May 2023 Payment.

108. Defendant represented to Plaintiff that the May 2023 Payment would be treated as an advance payment of the monthly installment payments set forth in the SWC Consulting Agreement and, upon its request and for any reason, the Debtor could access and utilized the funds that were paid to Defendant as part of the May 2023 Payment.

109. The Debtor did not authorize, direct, or consent to any removal, possession, dominion, destruction, disposition, or conversion of its ownership of the funds comprising the May 2023 Payment.

110. By cancelling and terminating the Debtor's ownership rights in, and taking exclusive possession and control over the Debtor's ownership interest in the funds comprising the May 2023 Payment, Defendant has permanently dispossessed the Debtor of its ownership interest in, and the use, possession, and enjoyment thereof.

111. There is no legal or equitable basis which justifies the termination and conversion by Defendant of its ownership interest in the funds comprising the May 2023 Payment.

24

112.    In unilaterally and unlawfully removing, terminating, and/or destroying the Debtor's ownership interest in the funds comprising the May 2023 Payment, Defendant has exercised dominion and control over the same since May 9, 2023, in contravention of the Debtor's exclusive ownership rights, use, possession, and enjoyment therein, and contrary to the representations that Defendant made to the Debtor as a means for inducing remittance of the May 2023 Payment.

113.    Prior to, and following the filing of the Bankruptcy Case, the Debtor made several demands for return of the May 2023 Payment from Defendant, including but not limited to, the Turnover Demand Letter transmitted through the Debtor's counsel in October 2023.

114.    All of the demands for return of the May 2023 Payment, including any portion thereof, were rejected and refused by Defendant.

115.    The Debtor, as a result of intentional and wrongful conduct of Defendant,  has and continues to suffer and sustain actual damages, including the loss of the funds comprising the May 2023 Payment and other damages to be proven at the trial of this civil action, all of which were foreseeable to Defendant when it undertook said actions and scheme to convert the entirety of the May 2023 Payment for itself.

116.    The Debtor, based upon the foregoing and as a direct and proximate result of said actions and conduct, is entitled to judgment against Defendant, in an amount exceeding SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together

25

with interest accruing thereon a maximum rate allowed under applicable North Carolina.

## FIFTH CLAIM FOR RELIEF
### Trespass to Chattels

117. The Debtor incorporates herein by reference, all the allegations set forth in the Complaint, as if fully set forth herein.

118. Defendant exercised, in an unauthorized manner, possession, access, dominion, and control over the funds comprising the May 2023 Payment, the Debtor's ownership interest therein was unilaterally and unlawfully terminated and cancelled by Defendant.

119. The Debtor's ownership interest in the May 2023 Payment, has an actual value of not less than $247,000.00.

120. Defendant, through its unauthorized access and possession the Debtor's ownership interest in the funds comprising the May 2023 Payment, which was rightfully owned by the Debtor, constituted the personal property of the Debtor.

121. Plaintiff, based upon representations and assurances that it was provided by Defendant, was led to believe that its ownership and possession of the May 2023 Payment would not be terminated upon payment and tender of the same to Defendant on May 9, 2023.

122. Defendant did not have permission or authorization from the Debtor to cancel or terminate its right, title, and ownership interest in the May 2023 Payment.

123. The Debtor, based upon the representations made by Defendant inducing it to pay the same, did not assign or transfer any ownership, control, or

26

dominion over the funds comprising the May 2023 Payment to Defendant on May 9, 2023, or any day thereafter up to and including the Petition Date.

124.   Plaintiff was not aware, until August 31, 2023, the date that Defendant unilaterally terminated the SWC Consulting Agreement and refused to refund any portion of the May 2023 Payment, that its ownership interest therein had been unilaterally and unlawfully terminated by Defendant without its knowledge, approval and consent.

125.   The unilaterally termination of the Debtor's right, title, and ownership of the May 2023 Payment, and subsequent exercise of exclusive possession, dominion, and control of the same by Defendant, constitutes a trespass to chattels.

126.   The Debtor, at all times relevant hereunder and, based upon the representations made by Defendant inducing it to remit the May 2023 Payment, was the sole lawful owner of the funds comprising the May 2023 Payment.

127.   The Debtor, as the rightful owner the funds comprising the May 2023 Payment, was entitled to actual and constructive possession thereof at all times relevant hereunder.

128.   On account of its ownership of the funds constituting the May 2023 Payment—likewise—the Debtor has ownership over, and entitled to actual and constructive possession of, said funds that were paid and transferred to Defendant under false pretenses.

129.   In exercising exclusive dominion, control, possession, and ownership over all of the funds constituting the May 2023 Payment, failing to perform all of its

27

duties and responsibilities under the SWC Consulting Agreement, and unilaterally terminating the SWC Consulting Agreement on August 31, 2023, Defendant unlawfully dispossessed and deprived the Debtor of his exclusive right, title, ownership and possession of the funds comprising the May 2023 Payment.

130. The removal, cancellation, termination, transfer, destruction, liquidation, and/or disposal of the Debtor's right, title, ownership, and interest in the funds comprising the May 2023 Payment, without the knowledge or authorization of the Debtor, was an unauthorized interference with the Debtor's right, ownership, use, and possession of the same.

131. Defendant, through its actions and conduct, engaged in a trespass to, and committed an unauthorized interference with, the Debtor's possession and enjoyment of its ownership interest in the funds comprising the May 2023 Payment.

132. Based upon the foregoing and as a direct and proximate result of the unlawful trespass and interference with the Debtor's ownership, use, and possession of the funds comprising the May 2023 Payment by Defendant,  the Debtor is entitled to judgment against Defendant, in an amount exceeding SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with interest accruing at the maximum rate allowed by North Carolina law.

**SIXTH CLAIM FOR RELIEF**
**Violations of North Carolina Unfair and**
**Deceptive Trade Practices Act**
**[N.C. Gen. Stat. § 75-1.1, *et seq*.]**

133. The Debtor incorporates herein by reference, all the allegations set forth in the Complaint, as if fully set forth herein.

134.    The actions and conduct of Defendants, delineated herein, constitute unfair or deceptive acts or practices, in or affecting commerce, in violation of N.C. Gen. Stat. § 75-1.1.

135.    Defendant's actions, in addition, have the capacity and tendency to deceive the average citizen, consumer, and/or business.

136.    Defendant, through its officers, employees, and agents, made the following false, misleading and deceptive representations, statements, and assurances to the Debtor:

> A.  Prior to and for the purpose of inducing the Debtor to remit the May 2023 Payment, Defendant advised, represented, and assured the Debtor that it would have access to, and be permitted to obtain the return and utilize at any time and for any reason, the funds that comprised the May 2023 Payment; and
>
> B.  Defendant represented and advised the Debtor, when the decision was made to file the Bankruptcy Case, that a portion of the May 2023 Payment that had been previously remitted by the Debtor would be returned and refunded due to the fact that no further services would be provided by Defendant in connection with the Bankruptcy Case or otherwise.

137.    Defendant's agents, officers, and employees, including Nugent, made the foregoing statements and representations to the Debtor, telephonically and/or in-person through the use an audio/video conferencing service.

138.    The Debtor, relying upon said representations, statements, and assurances made by Defendant, remitted the May 2023 Payment totaling $247,000.00 to Defendant on May 9, 2023, via wire transfer.

139.    Defendant's representation and assurances to the Debtor, concerning the May 2023 Payment, were coercive and designed to influence the Debtor's decision-

29

making process regarding payment of a substantial amount of its capital to Defendant on May 9, 2023.

140. The Debtor, through the exercise of reasonable diligence, could not have discovered that the representations and assurances made by Defendant concerning ownership, use, and access to the May 2023 Payment was false and misleading.

141. Likewise, and through the exercise of reasonable diligence, could not have discovered that the representation made by Defendant, that a portion of the May 2023 Payment would be returned and refunded to the Debtor when it determined to proceed with the filing of the Bankruptcy Case, was false and misleading.

142. The Debtor, given its engagement of Defendant, and under the SWC Consulting Agreement, trusted and believed that Defendant was acting, and would continue to act, in the Debtor's best interests with the goal of restructuring and reorganizing its debts through legitimate and lawful means and avenues.

143. Defendant, upon information and belief, concealed the fact that when it received the May 2023 Payment, it had no intention of returning or refunding any portion thereof to the Debtor, at any time and for any reason whatsoever.

144. Defendant violated the UDTPA by utilizing unfair, coercive, false, deceptive, and misleading practices, actions and representations as follows:

> A. Misrepresentation and concealment of material facts from the Debtor for the purpose of inducing the Debtor to transfer the May 2023 Payment to Defendant, including but not limited to, misrepresentations regarding Debtor's retention of complete ownership interest and rights therein from and after May 9, 2023;
>
> B. Conversion of the funds comprising the May 2023 Payment for its own exclusive use, benefit, and enjoyment;

30

C. Trespassing and unreasonably interfering with the Debtor's right, title, and ownership interest in the funds comprising the May 2023 Payment;

D. Refusing to turnover, upon demand made by the Debtor in the Turnover Demand Letter, the sum of $247,000.00 comprising the May 2023 Payment;

E. Exercising, contrary to § 362(a)(3) of the Bankruptcy Code, exclusive dominion and control over the May 2023 Payment, consisting of the sum of $247,000.00, in violation of the automatic stay;

F. Actions and course conduct detailed herein, which offends established public policy, federal and state law, are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to the general public.

145. But for the foregoing unfair, deceptive, and misleading conduct, actions, and representations of Defendant, the Debtor would not have transferred or otherwise paid the May 2023 Payment to Defendant on May 9, 2023.

146. All of the actions and conduct of Defendant, as alleged herein, were in an affecting commerce.

147. All of Defendants' actions and conduct, including the misrepresentations and omissions, have a tendency to deceive the ordinary consumer and business and, with respect to the Debtor, did deceive and mislead it into remitting the May 2023 Payment on May 9, 2023.

148. As a direct and proximate result of the unfair and deceptive actions, practices, and conduct of Defendant, the Debtor has suffered significant damage and injury, including loss of use of the funds comprising the May 2023 Payment, loss of

31

opportunities, and other damages alleged and asserted herein, together with legal costs, including reasonable attorneys' fees.

149.    The Debtor, likewise, and as a direct and proximate result of the actions and course of conduct displayed by Defendant, has expended significant attorneys' fees and expenses, all of which were necessary and required in connection with the prosecution of the above-captioned civil action.

150.    The Debtor, on account of the foregoing, is entitled to have and recover judgment against Defendant, and on account of its violations of the UDTPA, actual and compensatory damages in an amount exceeding SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), trebled pursuant to N.C. Gen. Stat. § 75-16, and the reasonable attorneys' fees and expenses incurred in connection herewith, as provided in N.C. Gen. Stat. § 75-16.1.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**Disallowance of Claim**
[11 U.S.C. § 502]

151.    The Debtor realleges and incorporates herein by reference all the allegations contained in the Complaint as if fully set forth in their entirety.

152.    Section 502(b)(9) of the Bankruptcy Code authorizes the disallowance of a claim "to the extent—proof of such claim is not timely filed[] . . . ." 11 U.S.C. § 502(b)(9); see In re Nutri*Bevco, Inc., 117 B.R. 771, 783 (Bankr. S.D.N.Y. 1990) ("Where a creditor has notice of the pendency of a bankruptcy case and is aware that it holds a disputed claim, notwithstanding the fact that it at no time received notice that its claim has been scheduled

as such, the creditor is barred for its failure to file a claim." (citing In re Middle Plantation of Williamsburg, Inc., 48 Bankr. 789 (E.D. Va. 1985))).

153.   The Debtor, on the Schedules and Statement of Financial Affairs [D.E. 68] filed in the Bankruptcy Case on October 17, 2023, scheduled, listed, and identified the claim of Defendant as disputed, which is summarized as follows:

| 3.408 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|
| | Second Wind Consultants<br>Attn: Manager, Agent, Officer<br>136 West Street<br>Northampton, MA 01060 | ■ Contingent<br>■ Unliquidated<br>■ Disputed | |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | |

(collectively, the "Disputed SWC Claim").

154.   Pursuant to E.D.N.C. LBR 3002-1,[2]  and on October 31, 2023, the Debtor filed and served a Notice of Disputed, Contingent or Unliquidated Claims [D.E. 106] (the "Disputed Claims Notice") in the Bankruptcy Case and upon, *inter alia*, Defendant, as the holder of the Disputed SWC Claim.

---

[2] Rule 3002-1 provides as follows:

> In addition to the duties set forth in Local Bankruptcy Rule 4002-1(b), the chapter 11 debtor shall notify each creditor whose claim is scheduled as contingent, disputed, or unliquidated of that fact within 14 days after filing the schedule of assets and liabilities or within 14 days after addition of any creditors to the petition.  Failure to notify a creditor that its claim is listed as disputed, contingent, or unliquidated shall result in the creditor's claim being deemed filed in the amount listed as disputed, contingent, or unliquidated, as though a proof of claim had been filed by the creditor.  The debtor shall file a certificate of service with the clerk of court within seven days after service has been made.

E.D.N.C. LBR 3002-1.

155. Federal Rule of Bankruptcy Procedure 3003(c)(2), identifying those creditors who are required to file a proof of claim, provides as follows:

> (2) *Who Must File*. Any creditor . . . whose claim or interest is . . . scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

Fed. R. Bankr. P. 3003(c)(2).   Under Fed. R. Bankr. P. 3003(c)(3), the deadline within which proofs of claim may be filed, is established by the bankruptcy court. Id. 3003(c)(3).

156. The deadline within which non-governmental creditors and parties-in-interest were required to file proofs of claim in the Bankruptcy Case was January 24, 2024 (the "Claims Bar Date"), which was established by the Court pursuant to the Bankruptcy Filing Notice.  The Bankruptcy Filing Notice provided the following instruction and direction to creditors, including those holding disputed claims:

> . **Proof of claim deadline**
>
> **Deadline for filing proof of claim:**
> **For all creditors (except a governmental unit):**    1/24/24
>
> A proof of claim is a signed statement describing a creditor's claim. A proof of claim may be filed online at www.nceb.uscourts.gov by accessing the Proof of Claim section. Alternatively, a proof of claim form may be obtained from the same website and submitted by mail. *When filing electronically, it is not necessary to complete a paper claim form.*
>
> Your claim will be allowed in the amount scheduled unless:
> • your claim is designated as *disputed, contingent,* or *unliquidated;*
> • you file a proof of claim in a different amount; or
> • you receive another notice.
>
> If your claim is not scheduled or if your claim is designated as *disputed, contingent,* or *unliquidated,* you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled.
>
> You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov.
>
> Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

Notice of Chapter 11 Bankruptcy Case [D.E. 4], at § 7.

157. Federal Rule of Bankruptcy Procedure 3003(c)(2) "compliments and effectuates § 502(b)(9) and § 1111(a) [of the Bankruptcy Code], which when read together provide that creditors in chapter 11 cases whose claims are scheduled as disputed, contingent or unliquidated must timely file a proof of claim or else their claims are subject

34

to disallowance." <u>Warner Angle Hallam Jackson & Formanek, P.L.C. v. Lock (In re LMM Sports Mgmt., LLC)</u>, No. AZ-15-1195, 2016 Bankr. LEXIS 2171, at \*15 (B.A.P. 9th Cir. June 1, 2016); <u>accord</u> <u>In re Bizgistics, Inc.</u>, No. 3:21-bk-02197, 2022 Bankr. LEXIS 2009, at \*10 (Bankr. M.D. Fla. July 13, 2022) (holding that secured claim was disallowed under Fed. R. Bankr. P. 3002(c)(2) based upon secured creditor's failure to timely file a proof of claim where its underlying secured claim was scheduled by the debtor as disputed); <u>In re U-Haul Co.</u>, No. 2:21-bk-20140, 2021 Bankr. LEXIS 3373, at \*13 (Bankr. S.D. W. Va. Dec. 10, 2021); <u>In re Frederes</u>, 98 B.R. 163, 164-65 (Bankr. W.D.N.Y. 1989).

158.    Under Fed. R. Bankr. P. 3003(c), and in order to have an allowed claim in the Bankruptcy Case, vote on any plan of reorganization proposed therein, or receive a distribution thereunder, Defendant was required to file a proof of claim, evidencing and substantiating the Disputed SWC Claim, prior to the Claims Bar Date.

159.    Defendant, prior to the Claims Bar Date and as of the filing of this Complaint, has not filed a proof of claim in the Bankruptcy Case, evidencing or substantiating any portion of the Disputed SWC Claim.

160.    Defendant, as the purported holder the Disputed SWC Claim and who failed to file a timely proof of claim with respect thereto, does not—shall not have—an allowed claim in the Bankruptcy Case under § 502 of the Bankruptcy Code.

161.    In accordance with Fed. R. Bankr. P. 3003(c)(2), and based upon its failure to timely file a proof of claim in the Bankruptcy Case, any claim, indebtedness or obligations purportedly due and owing to Defendant by the Debtor that arose prior to the

35

Petition Date, including the Disputed SWC Claim,  is disallowed in accordance with  § 502(b)(9) of the Bankruptcy Code.

162.   Defendant, as a result, and on account of any claim (including the Disputed SWC Claim) being disallowed in the Bankruptcy Case, has no right or entitlement to setoff or offset of any amount against the Debtor, which arose prior to the Petition Date.

163.   Based upon the foregoing, the Debtor is entitled to judgment against Defendant, disallowing in its entirety, any indebtedness, claim, liability, or obligation purportedly due and owing to Defendant, which arose prior to the Petition Date, including but not limited to the Disputed SWC Claim, pursuant to § 502 of the Bankruptcy Code and Fed. R. Bankr. P. 3003(c).

## PRAYER FOR RELIEF

**WHEREFORE,** and based upon the foregoing, the Debtor prays for the following relief:

1.   Have and recover judgment against Defendant avoiding the Transfers made by the Debtor to Defendant totaling $287,000.00, as constructively fraudulent pursuant to §§ 544 and 548 of the Bankruptcy Code and the UVTA;

2.   Have and recover judgment against Defendant: (a) Concluding that the sum of $247,000.00, comprising the payment and transfer made to Defendant on May 9, 2023, is "property of the estate" within the meaning of § 541 of the Bankruptcy Code, and shall be turned over to the Debtor in accordance with § 542(a) of the Bankruptcy Code; and (b) Requiring and compelling Defendant turnover the sum of $287,000.00 or in such other amount as determined by the Court, pursuant to § 550

36

of the Bankruptcy Code, together with interest accruing at the maximum legal rate until paid;

3.     Have and recover judgment against Defendant consisting of actual and compensatory damages in an amount exceeding the sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with interest accruing at the maximum rate allowed under applicable state and federal law;

4.     Have and recover judgment against Defendant, and on account of its violations of the UDTPA, consisting of actual and compensatory damages exceeding the sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), trebled pursuant to N.C. Gen. Stat. § 75-16, and together with interest accruing at the maximum rate allowed under applicable state and federal law;

5.     Have and recover judgment against Defendant, awarding the reasonable attorneys' fees, costs, and expenses incurred by the Debtor pursuant to N.C. Gen. Stat. § 75-16.1, in an amount to be determined by the Court during the course of the above-captioned adversary proceeding;

6.     Have and recover judgment against Defendant, disallowing any claim, indebtedness, or other obligation purportedly due and owing to Defendant and arising prior to the Petition Date, including that which was scheduled and identified as the Disputed SWC Claim, or arising from the SWC Consulting Agreement,  pursuant to § 502 of the Bankruptcy Code and Fed. R. Bankr. P. 3003(c)(2);

7.     Taxing the costs of this adversary proceeding against Defendant;

8.     Affording the Debtor a trial by jury on all issues so triable; and

37

9.      Awarding the Debtor such further relief as the court may deem just and proper.

Respectfully submitted this, the 11th day of September, 2025.

**BUCKMILLER & FROST, PLLC**

BY:    s/Joseph Z. Frost

MATTHEW W. BUCKMILLER
NCSB No. 35194
mbuckmiller@bbflawfirm.com

JOSEPH Z. FROST
NCSB No. 44387
jfrost@bbflawfirm.com

4700 Six Forks Road, Suite 150
Raleigh, North Carolina 27609
T: (919) 296-5040
F: (919) 977-7101

Counsel for Debtor-Plaintiff JSmith Civil, LLC